FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHWESTERN DIVISION

99 AUG 25  AM 9: 07

U.S. DISTRICT COURT
N.D. OF ALABAMA

NANCY BREWER,

      Plaintiff,

vs.                      CASE NO. CV-98-J-2010-NW

SUNRISE HEALTHCARE GROUP, INC.,
et al.,

      Defendant.

ENTERED 

## MEMORANDUM OPINION

AUG 2 5 1999

Currently pending before the court is the defendant Sunrise Healthcare Group, Inc.'s

("Sunrise") motion for summary judgment (doc. 15), and the defendant Wes Cecotti's

("Cecotti") motion for summary judgment (doc. 14), to which the plaintiff filed responses

("plaintiff's response"). Thereafter, the defendants each filed a reply to plaintiff's

responses.[1]

## I. Procedural History

Plaintiff commenced this action on or about June 30, 1998 by filing a complaint in the

Circuit Court of Colbert County alleging solely state law claims against the defendants,

including the tort of outrage (Count I), negligent supervision and negligent failure to

terminate (Count II -- against Sunrise only), assault and battery (Count III), invasion of

---

[1]In a separate action against the same defendants, Judy Stark, a co-employee of the plaintiff here, sues based on almost identical allegations. *See* CV-98-J-2009-NW, *Stark v. Sunrise, et al.* Both of the plaintiffs use each others deposition testimony as support for their own allegations, as well as the same documentary evidence. As such, some of Stark's allegations, the subject matter of a separate lawsuit, are discussed below.

privacy (Count IV) and conversion (Count V -- against defendant Sunrise only). Complaint at ¶¶ 8-25. The essence of plaintiff's complaint is that she was sexually harassed, although plaintiff states no cause of action under 42 U.S.C. § 1983. The defendants jointly removed this case to the United Stated District Court for the Northern District of Alabama on August 6, 1998 (doc. 1), based on diversity of the parties and the amount in controversy being greater than $75,000.00. *See* 28 U.S.C. § 1332.

This court rules as a matter of law that the evidence submitted in support of the plaintiff's claims for various state law causes of action does not support the allegations. The plaintiff has failed to raise any genuine issues of material fact for a jury to decide.

## II. Factual Background

In the light most favorable to the plaintiff, the facts of this case are as follows:

The plaintiff began working at Oak Crest nursing home in 1967. Plaintiff's brief in response to Sunrise's motion for summary judgment ("plaintiff's brief") at 1; Brewer depo. at 19. Her supervisor at that time was Bill Grimmet. Brewer depo. at 19. Defendant Sunrise leased the Oak Crest nursing home on June 1, 1997. Brewer depo. at 21. The plaintiff was the administrator at the defendant nursing home from 1983 until she was terminated on December 3, 1997. Plaintiff's brief at 1; Brewer depo at 20, 45. The supervisor at the time of the plaintiff's termination was Larry Baird, who had taken that position at the end of September or beginning of October, 1997. Plaintiff's brief at 1; Brewer depo. at 76, 163. Defendant Sunrise also employed a maintenance engineer, defendant Wes Cecotti, who

2

worked out of the Dallas, Texas office and oversaw twenty-eight nursing homes maintenance, housekeeping, landscaping and laundry. Depo. of Cecotti at 40-41. Cecotti's supervisor was Buz Schwitzgoebel. Depo. of Cecotti at 41.

After Mr. Baird took over the position of supervisor, he began getting anonymous phone calls regarding the behavior of the plaintiff and another employee, Judy Stark, towards other employees and the residents of the nursing home. Affidavit of Baird, Exhibit 6 to defendant's evidentiary submissions, at ¶ 4. Based on these anonymous phone calls, Baird sent out a survey asking the employees for their comments on the nursing home's day to day functioning. Id. at ¶ 5. Baird also arranged a meeting at a local hotel for the evening of November 19, 1997. *Id*. at ¶¶ 6, 7. Based on the content of the surveys and the allegations made at the meeting, Baird placed both the plaintiff and Judy Stark on administrative leave on November 20, 1997. *Id* at ¶ 11, defendant's Exhibit 6, with surveys attached thereto. *See also* depo. of Judy Stark at 141. *See also* affidavit of Rhonda Hanvey, Assistant Director of Nursing at Oak Crest Nursing Home, defendant's Exhibit 5 (stating the plaintiff Brewer and Judy Stark caused numerous problems at the nursing home).

According to Cecotti, he acts as a consultant to the individual nursing homes in that he can advise them, but cannot hire, fire or get involved in the individual nursing home's maintenance employees' salaries. However, he makes recommendations about work which needs to be done at the individual nursing homes, and stated that at Oak Crest, none of the work he recommended was ever completed. Depo. of Cecotti at 102-103.

3

The plaintiff alleges that in October, 1997, defendant Cecotti came into her office, shook her hand, and then: "He shook hands, brushed up against me. I moved away. I asked Dennis to come in there."[2]  Depo. of Brewer at 109.   Cecotti possibly asked her "how are you". Depo. of Brewer at 109. Brewer states that she just "moved away" from Cecotti. Depo. of Brewer at 109. The plaintiff testified that Cecotti "moved his hands" against her and that it was not accidental because he did it twice. Depo. of Brewer at 110. Brewer also stated that he touched her with one hand twice. Depo. of Brewer at 111. In response, the plaintiff moved away from him. Depo. of Brewer at 110. Brewer states that they were standing in the doorway when this happened. *Id*. She then called the facility's maintenance man, Dennis Cantrell, into her office. The plaintiff alleges that Mr. Cantrell came into her office within fifteen to twenty seconds because he was in the hallway. Depo. of Brewer at 112. The plaintiff told Cantrell that he needed to make rounds with Cecotti. *Id*. Cecotti then suggested that they tell each other dirty jokes before touring the nursing home. Depo. of Brewer at 112.

Mr. Cantrell testified that he has no memory of improper conduct by Cecotti towards Brewer. Depo. of Cantrell at 33. He does not recall Cecotti suggesting that they tell dirty jokes. Depo. of Cantrell at 28. Mr. Cantrell also stated in his deposition that he never witnessed Wes Cecotti touch Nancy Brewer in any inappropriate manner, nor did she ever

---

[2]The plaintiff testified that she did not know the date of the alleged harassment by Cecotti, but that she knew it was the week before she went to San Diego on October 21 or 22, 1997. Depo. of Brewer at 101.

mention it to him. Depo. of Cantrell at 86. He also testified that Cecotti is very professional and that he does not believe the plaintiff's allegations. Depo. of Cantrell at 34.

The plaintiff testified at her deposition that for some reason, Cantrell did not make rounds with Cecotti because "He [Cantrell] had to go take care of another problem -- get some tools or something. I'm not sure where he went." Depo. of Brewer at 117. She also alleges that Cecotti made further advances to her that same day after Cantrell left them. The plaintiff states that she and Cecotti went to one of the private rooms on wing 1 to inspect the windows because they would not open and Cecotti shut the door behind them. Depo. of Brewer at 117-118. Brewer states that Cecotti started making advances and asked her to accompany him to Louisiana to look at nursing homes there.[3] Depo. of Brewer at 118. Cecotti denies that this conversation ever took place. Depo. of Cecotti at 149.

Brewer also claims that Cecotti tried to place his arm around her waist, touched her shoulder, asked her if she "fooled around" and "patted her butt." Depo. of Brewer at 118-119, 130. Brewer states that she "kept moving away from him." Depo. of Brewer at 119. Brewer alleges that Cecotti told her that if she did not cooperate, the nursing home would not be refurbished.[4] Depo. of Brewer at 121-122, 124-125. Cecotti testified in his deposition

---

[3]According to Brewer, the substance of this conversation was that "he wanted me to see the nursing homes in Louisiana to see how bad they were, that I would not believe how they looked." Depo. of Brewer at 119.

[4]In an attachment to her deposition, dated October 15, 1997, Brewer alleges that Cecotti rubbed her shoulder and brushed his hand across her breast, after which she moved back and her apologized, so she did not think much about it. They then walked together to Wing 1, and he put his arm around her waist. In this version of her facts, Brewer states that while on Wing 1,

that he has never touched Brewer, that he has no doubt that she is lying about these claims and that none of the alleged suggestive conversations between him and Brewer ever took place. Depo. of Cecotti at 149, 151, 155.

Brewer did not mention these incidents to Cantrell. Depo. of Brewer at 121, 149. The plaintiff alleges that some of these statements by Cecotti were heard by Judy Stark, due to plaintiff's mashing the intercom button on her phone, which allowed Stark to hear the conversation between Cecotti and plaintiff while in plaintiff's office after the tour of the facility. Depo. of Brewer at 141. Ms. Stark testified in her deposition that she picked up the phone and heard "something to the effect of 'Cooperate or there will be no refurbishing. You can forget it.'" Depo. of Stark at 94. She further stated that it sounded like Mr. Cecotti's voice, but that she did not know who was in Brewer's office with her. Depo. of Stark at 94. Ms. Stark also heard "something about wing 1's ramp, something about rails or something. I heard about redoing the floors at the front of wing 2 and 3 ... I heard something about bathroom walls being replaced." Depo. of Stark at 95. Stark further testified that she assumed the male's voice belonged to Mr. Cecotti because the only other male in the building was Dennis Cantrell. Depo. of Stark at 97. The plaintiff testified that from the time

---

Brewer asked her if she wanted to hear a dirty joke and she replied no. He asked her if she messed around, and she said no. Brewer states that Cecotti then went into one of the private rooms with her to look at the windows, which needed replacing, and shut the door and asked her if she wanted to go out and eat. At this point, plaintiff alleges she was told that the nursing home might be refurbished if she cooperated.

6

she met Cecotti at her office and his hand brushed her breast until he left was not more than fifteen to twenty minutes. Depo. of Brewer at 125-126.

While in San Diego for the convention in October, 1997, after the day of events above, the plaintiff alleges that Cecotti again asked her to go to Louisiana with him.[5] Depo. of Brewer at 158. She stated that after he asked her to go to Louisiana with him this second time, she had no trouble at all avoiding him the rest of the time they were in San Diego. Depo. of Brewer at 160.

The plaintiff did not report these alleged incidents of harassment at the time they occurred, in spite of the company policy, of which she was aware. Depo. of Brewer at 97-98, 99. Brewer alleges that she tried to tell Baird, on November 5, 1997, about this incident as well as another one alleged by Judy Stark against Cecotti, but Baird would not listen to her. Consequently, she never told Baird about these incidents before being placed on administrative leave.[6] Depo. of Brewer at 176; Exhibit D-15, written rebuttal to employer's

---

[5]Both times Cecotti asked her to go to Louisiana, the plaintiff alleges that she said she would go if she could bring her husband and Cecotti said "Forget it." Depo. of Brewer at 158.

[6]In Exhibit D-15, Brewer alleges that while Baird was visiting the premises of the nursing home on November 5, 1997, she tried to tell him about Cecotti's advances, but he said only "I do not want to hear it, you are going to have to conform." In an unnumbered exhibit to her deposition, dated November 5, 1997, Brewer noted that Baird told her he had complaints from several people about her and had been told that she was a nonconformist. When the plaintiff mentioned Cecotti's name to Baird, Baird told her she needed to fit in with the"team". In her deposition, the plaintiff testified that Baird came in on November 5th and said to her that while in San Diego "they were all drinking ... and they all decided I was a nonconformist and the only was I could continue working at Oak Crest was to conform. While I was in San Diego he [Baird] harassed me the whole time I was there of why I did not drink, smoke, curse, and sleep around." Depo. of Brewer at 166. The plaintiff testified that this was Mr. Baird "harassing" her about these things but that no one actually asked her to sleep around, but she doesn't know who was swapping room keys. Depo. of Brewer at 166-167.

7

charges sent to the EEOC, dated February 18, 1998 and submitted at an exhibit to Brewer's

depo.

The plaintiff testified in her deposition that prior to being placed on leave, and perhaps

a day or two after the incidents at the nursing home:

> [Baird] called me, but all I can remember about that conversation he said,
> "Wes also told me you were not going to be a yes person. What is that about?"
> So I told him that's what it was about
> Q. And as best you can recall -- so he's asking you what's this about.
> Obviously he has heard from Mr. Cecotti that you said "I'm not going to be a
> yes person"?
> A. I'm sure.
> Q. And Mr. Beard (sic) asked you "what's that about"; right?
> A. Correct.
> Q. And what did you tell him?
> A. I told him I was not going to be a yes person.
> Q. Any more explanation than "I am not going to be a yes person"?
> A. No, nothing else.

Depo. of Brewer at 144-145.

> Q. All right. Now did you ever mention anything to Dennis about anything
> that Mr. Cecotti said that you thought was offensive sexually or he touched
> you or anything like that?
> A. No.

Depo. of Brewer at 149.

However, Brewer then testified that on November 5, 1997, while Baird was in her

office talking about her nonconformance, he apparently mentioned that she would not

conform to the budget. Depo. of Brewer at 173-174. The plaintiff said that she stayed within

the budget. Depo. of Brewer at 175. The plaintiff then mentioned she wanted to talk about

Wes Cecotti and Baird told her "I won't discuss him. You're only bringing him up because he's complained about you arguing about the floor in wing 1." Depo. of Brewer at 176.

The plaintiff and Judy Stark were both placed on administrative leave from the nursing home on November 20, 1997, around 9:00 or 9:30 a.m. Depo. of Brewer at 184, 193. The plaintiff states that she did not call anybody that day but a day or two after this tried to report her harassment claim to Baird's supervisor, Buz Schwitzgoebel. Depo. of Brewer at 184, 187. She testified that Ruth Hayes, a secretary, answered the phone, stated Mr. Schwitzgoebel was not in, and asked what the call was concerning. The plaintiff told her it concerned sexual harassment, but would not leave her name or the name of the person against whom she was making the charge with Ms. Hayes. Depo. of plaintiff at 187-188.

Brewer testified that she never actually told anyone associated with the defendant corporation about this incident until she called Nikki Mann in the corporate legal department in Arizona. *See* Exhibit D-15 to Brewer's depo. Plaintiff Brewer states that she told Ms. Mann about her own complaints, as well as those of Judy Stark.[7] Depo. of Brewer at 189. Nikki Mann handled the complaints well. Depo. of Brewer at 188-191. Brewer alleges that she was terminated from the defendant nursing home for not having sex with Cecotti.[8] Depo. of Brewer at 219. However, the plaintiff also testified that she was fired because she was a

---

[7]The plaintiff was also asked during her deposition whether she talked t anyone about Judy Stark's claim of sexual harassment against Wes Cecotti before her administrative leave. She responded that "We did not discuss ut with anybody. But when I called Texas and Albuquerque it was for both of us." Depo. of Brewer at 207.

[8]The plaintiff however, makes no allegation of wrongful termination or retaliatory discharge in her complaint, or in any document filed with the court to date.

9

"nonconformist mostly, because I did not agree with everything they told me. I didn't want to do what they wanted to do, and I think that was it." Depo. of Brewer at 218.

The plaintiff states that on November 20,1 997, the date she was placed on paid administrative leave, she was called to work early to meet with Baird. She arrived at the nursing home and was told he wanted her keys, to which the plaintiff responded:

> I gave him everything to the nursing home. I gave him every key. And he said, "you're on administrative leave," and I thanked him and I left. I went by and I said, "Judy, I'm gone." I told Wendy I was gone. I went home and packed and I went on vacation.

> It was a short meeting, I can't tell you – 5 minuted. I picked up my pictures of my daughter and a couple of other things and left.

Depo. of Brewer at 178-179. The plaintiff stated that she was told that there had been complaints about her, that employee surveys had been done and that an internal investigation was going to be done. Depo. of Brewer at 179.

The plaintiff also alleges that when she was terminated by the defendant Sunrise, she was not allowed to take with her a cherry table in the front foyer of the nursing home or some picture frames that she claims are hers. Depo. of Brewer at 231-232. The cherry table had been at the nursing home since 1983, having been placed there by Mr. Grimmitt. Depo. of Brewer at 232. The plaintiff also alleges that she was threatened with "further remedies" if she did not return personnel files to the nursing home. Depo. of Brewer at 234.

The plaintiff also testified that she had 261 hours of accumulated vacation time for which she was not compensated, as well as her 401(k). Depo. of Brewer at 236, 238. The

plaintiff stated that she does not know where she came up with the number of vacation hours she claimed. Depo. of plaintiff at 237.

### III. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp.,* 477 U.S. at 322-23. The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrates the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party to "go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, Fed. R. Civ. Pro 56(e). In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical

doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P. 56(c); *Matsushita*, 475 U.S. at 587, *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). The non-movant must "demonstrate that there is indeed a material issue of fact precluding summary judgment." *Clark v. Coates & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

On motions for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). The substantive law will identify which facts are material and which are irrelevant. *Anderson*, 477 U.S. at 248. All "reasonable doubts" about the facts and all justifiable inferences are resolved in favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). However, all "doubts" need not be so resolved. *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987). "The moving party is entitled to judgment as a matter of law if the nonmoving party cannot sufficiently show an essential element of the case to which the nonmoving party has the burden of proof." *Cornelius v. Town of Highland Lake*, 880 F.2d 348, 351 (11th Cir.1989), *cert. denied*, 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990).

A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id*. at 249. The basic issue before the court on a motion for summary judgment is "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Holcombe v. Alabama Dry Dock & Shipbuilding Corp.*, 1998 WL 758012 (S.D.Ala.); citing *Anderson*, 477 U.S. at 251-252.

Summary judgment is appropriate where the moving party shows an absence of evidence to support an essential element of the nonmoving party's case. *Weiss v. School Board of Hillsborough County*, 141 F.3d 990, 994 (11ᵗʰ Cir. 1998).

## IV. Legal Analysis

### A. Tort of Outrage (Count I)

To establish the tort of outrage, the plaintiff must allege three elements: (1) the actor intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result form his conduct; (2) the conduct was extreme and outrageous; and (3) the distress was severe. *Moore v. Spiller Associated Furniture, Inc.*, 598 So.2d 835, 836 (Ala.1992). The court finds that even accepting the plaintiff's version of the facts and her deposition testimony as absolutely true, she makes no showing of the level of harassment by Cecotti necessary to rise to outrageous conduct under Alabama law. In *Thomas v. BSE Industrial Contractors*, 624 So.2d 1041, 1044 (Ala.1993), the court stated that sexual harassment which is egregious is within the tort of outrage.[9] That case relied on *Busby v. Truswal Systems Corp.*, 551 So.2d 322 (Ala.1989). In *Busby*, the plaintiffs alleged severe,

---

[9]The Court stated that "the tort of outrage is a very limited cause of action that is available only in the most egregious circumstances. As a consequence, this court has held in a large majority of the outrage cases reviewed that no jury question was presented." *Thomas v. BSE Industrial Contractors, Inc.*, 624 So.2d 1041, 1044 (Ala.1993).

13

pervasive and repeated incidents of sexual harassment by their supervisor, including obscene and suggestive remarks, gestures and propositions as well as physical contact over an ongoing period of time. The Alabama Supreme Court, counting at least seventeen incidents of harassment, stated that under those particular facts, a jury could reasonably conclude that the supervisor had "intruded into the plaintiffs' sex lives in an offensive and objectionable manner and thereby invaded their right to privacy." *Busby*, 551 So.2d at 324. In Alabama, conduct which rises to the level of "outrageous" must be intentionally inflicted, extreme and outrageous. *American Road Services v. Inmon*, 394 So.2d 361, 365 (Ala. 1981). "The conduct of the defendant must be so outrageous in character and so extreme in degree as to go beyond all bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society." *Id.* The Alabama Supreme Court has recently stated that sexual harassment which is egregious can amount to the tort of outrage. *Henry v. Georgia-Pacific Corp.*, 730 So.2d 119, 121 (Ala.1998).

However, mere insults, indignations, threats, annoyances, petty oppressions or other trivialities do not constitute outrageous conduct. *Mills v. Wex-Tex Industries, Inc.*, 991 F.Supp. 1370, 1386 (M.D.Ala.1997); citing *Saville v. Houston County Healthcare Authority,* 852 F.Supp. 1512, 1519-20 (M.D.Ala.1994) (where court granted summary judgment for defendants where plaintiff alleged two non-consensual touchings of her buttocks, harassing statements, lewd comments and sexual advances). Neither mere requests for sexual favors, not demands which, if refused, carry consequence of economic loss or loss of status at

14

employment are sufficient. *Brewer v. Petroleum Suppliers, Inc.*, 946 F.Supp. 926, 936 (N.D.Ala.1996).

Assuming every allegation the plaintiff has made is true, on one day in October, 1997, defendant Cecotti brushed her breast twice, patted her buttocks, put his arm around her waist and attempted to hug her. The plaintiff responded each time by moving away. This court finds that these allegations most closely fit with the *Saville* case, where the court ruled that summary judgment for the defendants was appropriate. *See also McIsaac v. WZEW-FM Corp.*, 495 So.2d 649, 651 (Ala.1986) (where the court stated that where the plaintiff alleged unwanted kissing, dinner invitations and the like, no evidence of severe emotional distress was presented and summary judgment was appropriate as the defendant's behavior extended to mere insults, indignities, threats or annoyances); citing *Logan v. Sears, Roebuck & Co.*, 466 So.2d 121 (Ala. 1985).[10] No evidence has been put before this court to support the plaintiff's contention that "when examined in the light most favorable to the plaintiff is (sic) that Cecotti continuously manipulated Brewer's working environment in an effort to harass her." Plaintiff's brief in response at 9.

Here, the evidence shows, at most, that on one occasion Cecotti suggested that the plaintiff listen to dirty jokes (which apparently were not told), brushed her breast (possibly once, possibly twice, and possibly accidently), patted her buttocks one time, put his arm around her waist, suggested they eat lunch, and suggested she tour a nursing home in

---

[10]Under the same authority, the court in *McIsaac* held that the same actions were also insufficient to constitute a claim for invasion of privacy.

Louisiana with him. The plaintiff never reported this incident to anyone until after she was placed on administrative leave. At that time, the plaintiff claims she tried to report it but no one would listen. Further the court finds the evidence submitted by the plaintiff and consisting solely of her own testimony, to be contradictory and nonsensical. The court is unable to find that, assuming the plaintiff is being truthful, this one day of harassment rises to the level of outrageous conduct on the part of Cecotti.[11] Annoying, perhaps, but not outrageous or egregious.

## Negligent Supervision/Failure to Terminate (Count II)

While the plaintiff alleges in her complaint a count for negligent supervision/failure to supervise, the brief submitted in response to the defendant's motion for summary judgement states only that "[i]n *Perkins v. Dean*, in order for the student to prove his negligent supervision claim, the student "must show or demonstrate that [the school] had notice or knowledge (actual or presumed) of the [employee's alleged [conduct].' *Perkins v. Dean*, 570 So.2d 1217, 1219 (Ala.1990)."

In the facts before this court, there is no evidence that the defendant Sunrise knew or should have known about Cecotti's alleged conduct, because by the plaintiff's own

---

[11]The plaintiff also adds in her brief in response that she suffered severe emotional distress in that she was scared to tell her husband because he was a heart patient and therefore she had to suffer the harassment alone. Further, she claims she had a breast reduction. Not one shred of evidence is offered by the plaintiff in support of either of these allegations, mentioned nowhere in the pleadings. Plaintiff's brief in response at 10.

16

testimony, she never told anyone about it until after she was placed on administrative leave.[12] This is in spite of the fact that she alleges her own incident as well as vouching for Judy Stark's claim of an unwanted breast brushing before Brewer's claimed incident. This falls far short of the plaintiff's burden of affirmative proof that the alleged incompetence of the employee was actually known to the employer or was discoverable by the employer if it had exercised care and proper diligence. *Portera v. Winn Dixie of Montgomery,* 996 F.Supp. 1418, 1437 (N.D.Ala.1998); citing *Ledbetter v. United Am. Ins. Co.*, 624 So.2d 1371 (Ala.1993). *See also Mardis v. Robbins Tire & Rubber Co.,* 669 So.2d 885, 889 (Ala.1995). "The mere fact of an injury occurring is not evidence of negligence, and in negligent supervision cases, negligence will not be found by inference." *N.J. v. Greater Emanuel Temple Holiness Church*, 611 So.2d 10-36, 1037 (Ala.1992).

## Employer Liability

For Sunrise Corporation to be held liable for either of the intentional torts of Cecotti's, the plaintiff must show that (1) Cecotti's wrongful acts were committed "in the line and scope of employment"; *Busby*, 551 So.2d at 326, citing *Jessup v. Shaddix*, 275 Ala. 281, 154 So.2d 39 (1963); or (2) that the acts were committed in furtherance of Sunrise's business, *Solmica of the Gulf Coast, Inc. v. Braggs*, 285 Ala.396, 232 So.2d 638 (1970); or (3) that Sunrise participated in, authorized or ratified the wrongful acts; *Joyner v. AAA Cooper*

---

[12]The plaintiff offers no evidence to suggest that the reason she was fired is untrue, or that the surveys on which this termination was based were made up. The plaintiff alleges only that she knows of no one who stated bad things about her. The plaintiff does not challenge her termination or that the defendant had good cause to terminate her.

*Transportation*, 477 So.2d 364, 365 (Ala.1985). *See Mardis,* 669 So.2d at 889; *Potts v. BE&K Construction Co.*, 604 So.2d 398, 400 (Ala.1992). The determination of whether the conduct is within the line and scope of his or her employment depends upon the service in which the employee is engaged. *Doe v. Swift*, 570 So.2d 1209, 1211 (Ala.1990) ("the conduct of the employee ... must not be impelled by motives that are wholly personal, or to gratify his own feelings or resentment, but should be in promotion of the business of his employment").

In *Doe*, the Alabama Supreme Court stated that sexual misconduct, including assault and battery by an employee, is purely personal and outside the line and scope of his employment. *Doe*, 570 So.2d at 1211. *See also Busby*, 551 So.2d at 327, citing *Inmon* ("Here, Deaton's conduct was aimed purely at satisfying his own lustful desires; no corporate purpose could conceivably be served by his overtures. The plaintiff's ... complaints were sufficient to notify Farley that something was wrong, but not that Deaton's conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society").

The plaintiff here argues that Sunrise "ratified" the acts of Cecotti. To show that Sunrise authorized or participated in Cecotti's acts or ratified his conduct, the plaintiff must show that Sunrise (1) had actual knowledge of Cecotti's allegedly tortious conduct and that the tortious conduct was directed at and visited upon the plaintiff; (2) that based upon this knowledge, Sunrise knew, or should have known, that such conduct constituted a tort; and

18

(3) that Sunrise failed to take adequate steps to remedy the situation. *Mardis*, 669 So.2d at 889; citing *Potts v. BE & K Construction Co.*, 604 So.2d at 400.

The plaintiff is unable to show any ratification or even knowledge on the part of defendant Sunrise of Cecotti's behavior on or before the date she was put on administrative leave before being terminated on December 3, 1997. *See Kelly v. Worley*, 29 F.Supp. 1304, 1311-1312 (M.D.Ala.1998). Accordingly, this court finds that the plaintiff has failed to create a genuine issue of material fact regarding the employer-defendant's liability for Cecotti's actions. *See Busby*, 551 So.2d 322 (Ala.1989) (where court held that plaintiffs notifying management in general terms of the harassment without giving details and without giving the company time to correct the situation was insufficient for the company to be liable on the claim of outrage).

## Assault and Battery (Count III)

An assault and battery is defined as any touching by one person of the person or clothes of another in rudeness, in anger, or in a hostile manner. An intent to injure is not required. *Mills*, 991 F.Supp. at 1382, citing *Prescott v. Independent Life & Accident Ins. Co.*, 875 F.Supp. 1545 (M.D.Ala.1995)(other citations omitted). The defendants here argue that an "inadvertent bumping" does not support an assault and battery claim. Relying on *Allen v. Walker*, 569 So.2d 350, 351 (Ala.1990), the defendants state that the plaintiff must show "an intentional touching in a rude or angry manner." The tort is further defined as that the touching must create in the mind on the party alleging assault a well-founded fear of an *imminent* battery, coupled with the apparent present ability to effectuate the attempt if not

19

prevented. *Allen*, 569 So.2d at 351, citing *Western Union Telegraph v. Hill*, 25 Ala.App. 540, 542, 150 So. 709, 710, *cert. denied* 227 Ala. 469, 150 So. 711 (1933); *Holcombe v. Whitaker*, 294 Ala. 430, 435, 318 So.2d 289, 294 (1975). *See also Scott v. Estes*, 1999 WL 606884 at 10 (M.D.Ala. Aug. 4, 1999); citing *Allen, supra*. The court here finds that the plaintiff, in her deposition, stated that when Cecotti allegedly touched her in an unwanted manner, she merely "moved away" from him. Depo. of Brewer at 109, 127.

### Invasion of Privacy (Count IV)

Under the theory of an intrusion upon the seclusion of a person as constituting the alleged invasion of privacy of the plaintiff, the wrong consists of "the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." *McIsaac v. WZEW-FM Corp.*, 495 So.2d at 651 (where court find that employers conduct in asking a female employee to "be available," trying to kiss her and then attempting to have her fired for resisting his advances did not establish an invasion of privacy claim). *See also Scott v. Estes*, 1999 WL 606884 at 11 (where court found that *repeatedly* conditioning receipt of promotion on giving into sexual advances and allegation of sexual assault sufficient to survive motion to dismiss).

The plaintiff relies on *Phillips v. Smalley Maintenance Services*, 435 So.2d 705 (Ala.1983) to support her argument that sexual harassment can form the basis for an invasion of privacy claim. What *Phillips* does not support is plaintiff's claim that Cecotti's behavior here rises to the level of an invasion of privacy. In *Phillips,* the plaintiff alleged that her boss called her into his office, locked the door, asked how often she and her husband had sex and

20

what "positions" they used two to three times a week. The defendant also asked her whether she had ever engaged in oral sex; insisted that she have sex with him or risk losing her job, knowing that her family depended on her income; and got angry at her and insisted that she have oral sex with him at least three times a week. *Phillips*, 435 So.22d at 707. In contrast, asking the plaintiff for a date and making sexual propositions usually do not constitute an invasion of privacy, although extensive inquiries into one's sex life or looking up one's skirt might. *Ex parte Atmore Community Hospital*, 719 So.2d 1190, 1194 (Ala.1998). The facts alleged before the court here simply do not constitute a wrongful intrusion into the plaintiff's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." *McIsaac*, 495 So.2d at 651.

While the plaintiff argues that the evidence in the light most favorable to her shows that Cecotti asked her twice (not repeatedly as plaintiff claims) to take trips with him, by the plaintiff's own testimony, these trips were to visit nursing homes in Louisiana. This court can find nothing openly sinister in something so directly related to the plaintiff's job as touring another nursing home also owned by the defendant Sunrise. The court is also aware that Cecotti denies these conversations ever occurred. Even if they did, and in the light most favorable to the plaintiff, the court finds that this allegation is not sufficient, alone or in conjunction with other allegations, to be an invasion of the plaintiff's privacy. Likewise, the other statements the plaintiff alleges Cecotti made were so indefinite as to their purpose and meaning, and the physical contact so minimal and possibly even accidental, that this court

is unable to find facts sufficient to raise a genuine issue of material fact as to the plaintiff's invasion of privacy claim.

### **Conversion** (Count V)

The plaintiff has submitted no evidence in support of her claims for conversion beyond her own deposition testimony. No pay stubs showing either accrued vacation time nor 401K contributions have been submitted. Evidence sufficient to support the creation of genuine issues of material fact on this count of the complaint is simply nonexistent.

### **Conclusion**

This court, having considered all of the evidence submitted by the parties, finds that the plaintiff fails in her burden to show any evidence sufficient to survive the defendants' motions for summary judgment. The court finds that, as a matter of law, the evidence is such that a reasonable jury could not return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248. The evidence presented by the parties does not create a sufficient disagreement on material facts as to require submission to a jury. *See Holcombe v. Alabama Dry Dock & Shipbuilding Corp.*, 1998 WL 758012 (S.D.Ala.); citing *Anderson*, 477 U.S. at 251-252. Lacking is substantial evidence of the allegations underlying the plaintiff's complaint.

As such, the court being of the opinion both defendant's motions for summary judgment are due to be granted;

It is therefore **ORDERED** by the court that defendant Sunrise's motion for summary judgment be and hereby is **GRANTED** on all counts of the complaint.

It is further **ORDERED** by the court that defendant Cecotti's motion for summary judgment be and hereby is **GRANTED** on all counts of the complaint.

This case is **DISMISSED** with **PREJUDICE**.

**DONE** and **ORDERED** this the ____24____ day of August, 1999.

INGE P. JOHNSON
UNITED STATES DISTRICT JUDGE

23